# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ROBERT TRUJILLO YOUNG,**

　　　　**Petitioner,**

**v.**　　　　　　　　　　　　　　　　　　**Case No. 1:11-cv-1139 MV/WDS**

**JAMES LOPEZ, Warden, et al.,**

　　　　**Respondents.**

### MAGISTRATE JUDGE'S PROPOSED FINDINGS
### AND RECOMMENDED DISPOSITION[1]

By *Order of Reference Relating to Bankruptcy Appeals, Social Security Appeals, Prisoner Cases, Non Prisoner Pro Se Cases, and Immigration Habeas Corpus Proceedings* [Doc. 9], filed April 25, 2012, this matter was referred to the undersigned Magistrate Judge to conduct hearings as warranted and to perform any legal analysis required to recommend an ultimate disposition of the case. The Court recommends the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody [Doc. 1] be DENIED and this case be DISMISSED with prejudice.

## I.　　BACKGROUND

Petitioner Robert Trujillo Young is incarcerated in New Mexico pursuant to a New Mexico state court judgment. He seeks habeas relief under 28 U.S.C. § 2254.

Petitioner was incarcerated and serving a lengthy sentence on August 31, 1999, when he allegedly was involved in the murder of corrections officer Ralph Garcia and the attempted murder of fellow inmate Adrian Mares. The following facts are taken from parts of the record, but primarily

---

[1] Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

from the summary of trial testimony in the opening brief Petitioner submitted on direct appeal to the Supreme Court of New Mexico.  [Doc. 8-7 at 10–48.]

At the time of the attacks, Petitioner was alleged to be one of the leaders of the Los Carnales prison gang at the Guadalupe County Correctional Facility in Santa Rosa, New Mexico, where these events occurred.  The Los Carnales gang allegedly was in control of the Guadalupe County Correctional Facility, and rival gang members generally were not housed there because of an ongoing gang war.  Petitioner suspected inmate Adrian Mares belonged to a rival gang and directed lower ranking members of Los Carnales to kill him.  At Petitioner's direction, gang member Dominic Tafoya was supplied with a shank and deployed to kill Adrian Mares.  Tafoya found Mares in the gym and attacked him with the shank.  Tafoya stabbed Mares multiple times and injured him severely, but did not ultimately succeed in killing him.  Mares managed to flee from Tafoya and was taken for medical treatment; Tafoya was subdued and disarmed.

An additional part of Petitioner's plan that day was to murder a particular correctional officer. The plan changed, however, and he decided instead to kill the first correctional officer that came through the pod door.  Ralph Garcia happened to be the first correctional officer that came through the door.  Petitioner and two of his fellow Los Carnales gang members had previously armed themselves with shanks and were waiting.  Officer Garcia yelled for the pod to lockdown; Petitioner and his two cohorts then set upon Officer Garcia and began stabbing him.  Other inmates joined the attack and begin kicking and punching Officer Garcia.  Officer Garcia suffered in excess of 28 stab wounds and did not survive.  A riot ensued and inmates allegedly ran amok in the facility for several hours destroying property and setting fires until the state police arrived to quell the disturbance.

Petitioner was indicted in May 2000 for first degree murder and other crimes related to these

incidents.  [Doc. 8-1 at 12.]  In November 2000, the State gave notice of intent to seek the death penalty alleging two aggravating circumstances:  (1) murder of a peace officer, and (2) murder by an inmate of one who is lawfully on the premises of a penal institution.  [Id. at 13.]

On December 5, 2008, a jury found Petitioner guilty of:  (1) First Degree Murder (Felony Murder); (2) Conspiracy to Commit First Degree Murder of Ralph Garcia; (3) Conspiracy to Commit First Degree Murder of Adrian Mares; (4) Attempt to Commit First Degree Murder of Adrian Mares; (5) Possession of a Deadly Weapon by a Prisoner; (6) Tampering with Evidence; and (7) Unlawful Assault on a Jail. [Doc. 8-1 at 3–4.]  A state court judge found Petitioner was a habitual offender and sentenced him to life (as defined by statute) plus twenty-four years, followed by two years of parole. [Id. at 5.]

In the more than eight years between indictment and conviction, Petitioner's case went through extensive discovery and motion practice, a change of venue, and two interlocutory appeals. The first interlocutory appeal challenged the district court's denial of Petitioner's motion to dismiss the aggravating circumstances that made him eligible for the death penalty.  The Supreme Court of New Mexico (SCNM) affirmed, and remanded the matter to proceed as a death penalty case.  [Doc. 8-2 at 20.]

In the second interlocutory appeal, Petitioner and a co-defendant argued they were deprived of effective assistance of counsel because their attorneys were inadequately compensated.  Defense counsel were attorneys under contract to the New Mexico Public Defender Department and were providing representation for a flat fee.  The SCNM held that the compensation was so inadequate

for a death penalty case that Petitioner was deprived of the effective assistance of counsel.[2]  [Doc. 8-6 at 8–13.]  As a remedy, the SCNM stayed prosecution of the death penalty unless and until the State made adequate funds available for the defense.  [Id. at 18.]  Following remand, the district court granted Petitioner's unopposed motion to dismiss the death penalty.  [Doc. 8-8 at 45–46.]  Petitioner was convicted approximately one year after conclusion of the second interlocutory appeal.

The SCNM affirmed the conviction on direct appeal.  Petitioner brought a pro se Petition for Writ of Habeas Corpus, which the district court summarily denied.  [Doc. 8-9 at 1– 16, 17.]  Petitioner then brought a pro se Petition for Writ of Certiorari.  [Id. at 18–33.]  The SCNM ordered a response.  [Doc. 1 at 34.]  After considering the State's response, the SCNM denied the petition in a summary order.  [Doc. 8-9 at 51.]

Petitioner asserts eight grounds for federal habeas relief:  (1) violation of his Sixth Amendment right to a speedy trial; (2) erroneous admission at trial of evidence of Petitioner's alleged gang affiliation; (3) error in the jury instructions; (4) ineffective assistance of counsel based on failure to obtain qualified expert testimony; (5) violation of the right to testify on his own behalf; (6) ineffective assistance of counsel based on an alleged conflict of interest; (7) ineffective assistance of counsel based on funding limitations and other unspecified errors; and (8) ineffective assistance of appellate counsel.  Respondents argue the petition is mixed (containing both exhausted and unexhausted claims), and specifically that grounds two and three are not exhausted.  Respondents concede exhaustion of the remaining six grounds.

---

[2] Fees under the original contract were capped at $19,500 through trial for each first-chair attorney and $9,500 for each second chair attorney.  [Doc. 8-6 at 8–9.]  The Supreme Court of New Mexico concluded that even the additional $100,000 per defense team the Legislature subsequently appropriated would be inadequate given the extraordinary demands of the case.  [Doc. 8-6 at 16.]

## II.      DISCUSSION

### A.      Legal Standards

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the Court's review of any claim the state courts adjudicated on the merits is deferential.  Petitioner will be entitled to habeas relief only if he can establish that the state courts' resolution was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

State prisoners also must satisfy an exhaustion requirement.  The applicant generally may not raise a claim for federal habeas corpus relief unless he "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  To exhaust a claim, a habeas applicant must pursue it through "one complete round of the State's established appellate review process," giving the state courts a "full and fair opportunity" to correct alleged constitutional errors.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Fair presentation requires that the federal issue be presented properly to the highest state court, either by direct review of the conviction or in a post-conviction attack.  *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994).

The Court may deny an application on the merits in some circumstances notwithstanding the applicant's failure to exhaust.  28 U.S.C. § 2254(b)(2); *Moore v. Schoeman*, 288 F.3d 1231, 1235 (10th Cir. 2002) (holding that individual, unexhausted claims may be denied if the result allows the court to deny the entire petition on the merits).  "[A] district court faced with a habeas petition containing unexhausted claims may either (1) dismiss the entire petition without prejudice to permit exhaustion of state remedies, or (2) deny the entire petition on the merits." *Moore*, 288 F.3d at 1235

(footnote omitted).

### B.      Exhaustion

Respondents contend Petitioner failed to exhaust his second and third claims.  To meet the exhaustion requirement, the claim must be presented to the state courts in such a manner that the court is alerted to its federal nature.  *Baldwin v. Reese*, 541 U.S. 27, 29–30, 124 S.Ct 1347, 1349–50(2004).  According to Respondent, although raised on direct appeal, the second and third claims were presented only as state law claims.

"If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  *Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S.Ct. 887, 888 (1995).  A petitioner need not invoke "talismanic language" or cite "book and verse on the federal constitution."  *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir. 1989) (internal quotations omitted).  "Rather, the crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim."  *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (citing *Picard v. Connor*, 404 U.S. 270, 278 (1971)).

### 1.      Claim two is exhausted.

On direct appeal, Petitioner raised his claim that the introduction of evidence of gang affiliation was reversible error, and he argued it primarily as a violation of state rules of evidence. [Doc. 8-7 at 33–40.]  However, the Court does not agree that state law was the only basis Petitioner presented.  He also argued the repeated and ongoing references to his alleged gang association was prejudicial and inflammatory, denying his right to a fair trial; moreover, Petitioner specifically cited

the United States Constitution in support of his gang evidence argument, though arguably he did not cite the applicable provisions.  [Id. at 37–38, 42.]   Though the SCNM ruled only on state law grounds, Petitioner's brief presented the opportunity to rule on the federal constitutional issue.  The Court therefore concludes this claim is exhausted.

### 2.      Claim three is not exhausted.

Petitioner's jury instruction claim, on the other hand, was not presented in a manner that would have alerted the SCNM to its federal nature.  Petitioner argued that the trial court erroneously refused his proffered foreseeability instruction and that the instructions were confusing to the jurors.  [Doc. 8-7 at 42–46.]  Petitioner cited several state court cases, but his brief cannot be read as asserting a claim under the federal constitution.  Accordingly, the Court concludes Petitioner's jury instruction claim is not exhausted.

### 3.      The Court recommends denying the petition in its entirety.

The Petition contains one unexhausted claim, claim three.  As discussed below, however, the Court concludes that none of the claims have merit.  This case has already burdened the courts of the State of New Mexico for many years.  Thus, in the interest of economy, for the courts and the parties, the Court recommends the Petition be denied on the merits and dismissed in its entirety notwithstanding Petitioner's failure to exhaust his third claim.

### C.      Merits

### 1.      Claim One:  Denial of Sixth Amendment right to a speedy trial

Petitioner argues that the more than eight year delay between indictment and conviction violated his right to a speedy trial.  The SCNM considered this claim on direct appeal—on the merits and applying federal law—and concluded the delay did not violate Petitioner's speedy trial rights.

[Doc. 8-8 at 46–57.]

In *Barker v. Wingo*, the United States Supreme Court provided a four-part balancing test for speedy trial claims. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182 (1972). Because the SCNM's decision rests on a balancing of the *Barker* factors, this Court must review the SCNM's findings on each of the factors "for the limited purpose of determining whether any finding is contrary to clearly established Supreme Court precedent or based upon facts that are clearly and convincingly erroneous in light of the state court record." *Jackson v. Ray*, 390 F.3d 1254, 1260 (10th Cir. 2004).

Habeas relief is not available if the SCNM's conclusion was merely incorrect or erroneous; this Court's review is limited to determining whether the state court's application of federal law was objectively unreasonable. *Jackson*, 390 F.3d 1259. Furthermore, because speedy trial claims are subject to a balancing test, the fact that the SCNM's findings on one or more of the factors is contrary to clearly established Supreme Court precedent is insufficient to grant habeas relief. *Id.* at 1260. "Habeas relief is only available if there is no possible balancing of the factors that both supports the [SCNM's] decision and is not contrary to clearly established Supreme Court precedent." *Id.*

### a.    Length of the delay

The first *Barker* factor is the length of the delay. *Barker*, 407 U.S. at 530–31. It presents a dual inquiry. First, it acts as a triggering mechanism: only if the delay is "presumptively prejudicial" must the analysis proceed to the remaining factors. *Id.* at 530. Second, if the delay is "presumptively prejudicial," "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum need to trigger judicial examination of the claim." *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 2691 (1992).

8

The SCNM concluded that the length of the delay between Petitioner's indictment and his trial, a period of over eight years, or 102 months, triggers a comprehensive speedy trial analysis. [Doc. 8-8 at 48–49.] This conclusion is not objectively unreasonable. *See Doggett*, 505 U.S. at 652 (holding 8½ year lag between arrest and indictment suffices to trigger speedy trial inquiry).

### b.       Reason for the delay

"The flag all litigants seek to capture is the second factor, the reason for the delay." *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S.Ct. 648, 656 (1986). Different weights apply to different reasons. *Barker*, 407 U.S. at 531. Deliberate attempts to delay the trial in order to hamper the defense weigh heavily against the government. *Id.* "[N]eutral reasons such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant." *Id.* "Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

The SCNM divided the time from indictment to trial into four blocks of time: (1) the interlocutory appeals; (2) the period from indictment until certification of the first interlocutory appeal; (3) the period between interlocutory appeals; and (4) the period from the SCNM's stay of the death penalty prosecution in the second interlocutory appeal until trial. For each block of time, the SCNM considered the reasons for delay and assigned a weight. Its conclusion was that most of the delay was neutral and only the third block of time, fifteen of the 102 months, weighed against the State. As a result, the SCNM found the second factor weighed slightly in Petitioner's favor. [Doc. 8-8 at 53.]

As discussed below, as to each block of time, the SCNM reached an objectively reasonable

conclusion that is not contrary to clearly established law.  Accordingly, its conclusion as to the second *Barker* factor as a whole was not objectively unreasonable.

### (1)     Interlocutory appeals

The two interlocutory appeals accounted for the longest delay—41 months.  The SCNM concluded that this delay counted against neither party.  [Doc. 8-8 at 50–51.]  It rejected Petitioner's argument that the interlocutory appeals should  count against the State because they were necessary to secure his constitutional right to effective assistance of counsel.  The SCNM stated that the argument "did not satisfy Defendant's burden to show that the State caused unreasonable delay during the interlocutory appeals or that this Court's time in deciding the appeals was unjustifiably long."  [Id.]

The Tenth Circuit holds that the burden on the second *Barker* factor lies with the state, and that it is against clearly established law to place the burden on the defendant, as the SCNM apparently did in this instance.  *Jackson*, 390 F.3d at 1261–62.   However, when the reason for the delay is an interlocutory appeal by the defendant, the Supreme Court holds that the defendant bears the burden of "showing an unreasonable delay caused by the prosecution in that appeal, or a wholly unjustifiable delay by the appellate court," and moreover, that the burden is heavy even when the defendant's appeal is meritorious.  *Loud Hawk*, 474 U.S. at 656–57.  Thus, it was not contrary to clearly established law to place the burden on Petitioner to show delay caused by the interlocutory appeals should weigh against the state, nor was it unreasonable to conclude that he had not met this burden.

10

(2)      **Indictment until certification of the first interlocutory appeal**

The delay from the date of the indictment until certification of the first interlocutory appeal was approximately 34 months.  [Doc. 8-8 at 51.]  During this period, both parties exercised peremptory excusals of assigned judges, Petitioner moved to sever his trial from that of his co-defendants, moved to change venue, and requested several continuances. [Id.] The State moved for extensions of time, which Petitioner did not oppose, filed witness and evidence lists, begin gathering witness statements, demanded evidence and witness lists from Petitioner, and requested a trial setting.  [Id.]  The SCNM concluded this delay counted against neither party.  [Id. at 52.]

The SCNM's conclusion is not contrary to clearly established law.  The time period from indictment to the first interlocutory appeal appears characterized not by delay, but by vigorous advocacy on both sides.  On direct appeal, Petitioner argued that the State contributed to the delay by joining numerous co-defendants which in turn had the effect of increasing the number of available judicial disqualifications available.  [Doc. 8-7 at 31–32.]  Petitioner does not argue, however, that the State was attempting in bad faith to hamper the defense by delaying trial, or even that the State was negligent, as would be required to weigh this period against the State.  *See Barker*, 407 U.S. at 531.  Any suggestion that the State was engaging in delay tactics is countered by the apparently undisputed fact that the State attempted to obtain a trial setting during this period.

(3)      **Between interlocutory appeals**

The period between the two interlocutory appeals accounted for approximately 15 of the 102 months.  [Doc. 8-8 at 52.]  During this time, the trial court heard numerous motions to compel adequate funding for the defense and Former Chief Justice Franchini presided over a mediation

between the State and defense counsel in an attempt to reach an agreement as to payment.  [Id. at 52–53.]  The SCNM considered this period an administrative burden of the criminal justice system and counted it against the State, though not heavily because the prosecution was not acting intentionally to cause the delay.  [Id. at 53.]

The  SCNM's conclusion that this delay did not weigh heavily against the State is not objectively unreasonable.  Delay is weighed heavily against the state if it is a deliberate attempt to hamper the defense.  *Barker*, 407 U.S. at 531.  During this period, the State opposed defense efforts to compel additional funding from the Public Defender, but there is no indication the State was using delay as a means to deliberately hamper the defense.[3]  Rather, the State was grappling with an extraordinarily complex, multi-faceted funding issue implicating all three branches of government.

### (4) From the stay of the death penalty prosecution until trial

Approximately twelve months elapsed from the time the SCNM stayed prosecution of the death penalty until trial commenced.  [Doc. 8-8 at 53.]  The SCNM concluded this period counted against neither party for purposes of a speedy trial claim, because both sides were actively preparing for trial.  [Id.]

The SCNM's conclusion is not objectively unreasonable.  "Our speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable."  *Doggett*, 505 U.S. at 656.  For purposes of a speedy trial analysis, "great weight" is attached to considerations of trial preparation, so long as the Government is pursuing the matter diligently.  *See id.*  The fact that it took twelve months to bring Petitioner to trial after the SCNM imposed a stay does not suggest a lack of

---

[3]Although the State denied the judiciary's authority to compel funding, it appears the Public Defender was at least partially successful in lobbying additional funding for the death penalty defense from the legislature.  [Doc. 8-6 at 9.]

diligence, especially given that four months of that delay were occasioned by Petitioner who moved to reschedule the trial from July 2008 to November 2008.  [Doc. 8-8 at 53.]

### c.    Assertion of right

The SCNM found that Petitioner did not assert his right to a speedy trial until over eight years after he was indicted and that this factor therefore weighed against him.  [Doc. 8-8 at 53–54.]  This conclusion is not objectively unreasonable.

Petitioner does not challenge the SCNM's conclusion that he did not assert his speedy trial right until April 30, 2008, and the Court has no reason to question the conclusion.  Though a defendant does not necessarily waive his right to a speedy trial by failing to assert it in a timely manner, the fact that Petitioner waited over eight years "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."  *Barker*, 407 U.S. at 527–28, 531–32.  When a defendant waits to assert his speedy trial right, a court may reasonably conclude he did not want a speedy trial.  *See id.* at 534–35.  The SCNM's conclusion, therefore, was not contrary to clearly established law.

### d.    Prejudice

The SCNM concluded that "this factor did not weigh in favor of Defendant because Defendant did not meet his burden of producing evidence to show prejudice."  [Doc. 8-8 at 54.]  In concluding that Petitioner was not prejudiced, the SCNM noted that he was serving a 20-year sentence when he was indicted in 2001 and therefore was not subjected to oppressive pretrial incarceration, that the lengthy delay resulted in dismissal of the death penalty, and that any impairment of the defense was minimal.  [Id. at 54–55.]

Placing the burden on Petitioner to produce evidence of prejudice was an objectively

unreasonable application of federal law.  "[C]onsideration of prejudice is not limited to the specifically demonstrable" and "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655.  Under federal law, courts "generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify." *Id.*

### e.      Balancing

Petitioner is not entitled to habeas relief merely because the SCNM's application of one of the *Barker* factors—prejudice, in this case—was objectively unreasonable. *See Jackson*, 390 F.3d at 1266–67. "Habeas relief is only available if there is no possible balancing of the factors that both supports the [state court's] ultimate decision and is not contrary to clearly established Supreme Court precedent." *Id.*  The Court therefore independently undertakes to determine whether there is any possible balancing of factors that both supports the SCNM's ultimate decision and also is not contrary to clearly established Supreme Court precedent.

### (1)      First and second *Barker* factors

The Court considers the first two factors together because they are closely related. *Barker*, 407 U.S. at 531 (length of delay and reason for the delay are closely related).  Eight and one-half years is a lengthy period under any circumstances.  However, the extraordinary delay here is somewhat mitigated due to the extraordinary and complex nature of the case. *See id.* at 530–31 (delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge).  Death penalty prosecutions are complex to begin with, and this case was further complicated by two interlocutory appeals, and a grossly underfunded defense. Moreover, this case is widely believed to be one of the most complex death penalty cases ever tried in New

Mexico, with 15 named defendants, over 100 witnesses identified, and tens of thousands of pages of discovery  [Doc. 8-6 at 8.]

When the length of the delay is considered in conjunction with the reasons for the delay, it is possible to reach a balancing of these two factors that supports the SCNM's ultimate conclusion that a speedy trial violation did not occur.  Delay counts against the state and in favor of a speedy trial claim when the delay is occasioned by the state's bad faith or negligence. *Barker*, 407 U.S. at 531.  Thus, where the government has negligently failed to pursue a defendant, an unexplained 8½-year delay may support a speedy trial claim.   *Doggett*, 505 U.S. at 657 (weight assigned to negligence in pursuing defendant compounds over time).   In this case, by contrast, even though the amount of time it took to bring Petitioner to trial was unusually long, the record does not reveal any evidence of bad faith or even negligence on the part of the state.  To the contrary, from the Court's examination of the record, it appears the state diligently prosecuted Petitioner and sought to move the case toward trial throughout the entire time he was under indictment.  Petitioner, on the other hand, moved to continue the trial date on several occasions.  [Doc. 8-7 at 20.]  Although Petitioner contends that in addition to failing to provide adequate funding for the defense, the state made certain litigation choices that protracted the proceedings, such as choosing to join numerous defendants, electing to pursue the death penalty, and trying the less culpable cases first [Doc. 8-7 at 19, 25], nowhere is it contended the prosecution took the decisions in bad faith or for the purpose of hampering the defense by delay.

Furthermore, the defense occasioned more than half of the 102-month delay with interlocutory appeals and attempts to compel adequate funding.  Absent the delay incurred by interlocutory appeals and the period between interlocutory appeals, the length of time to bring

Petitioner to trial would not have been extraordinary for a death penalty case.  The Court will not weigh these delays against Petitioner's speedy trial claim; however, under clearly-established Supreme Court precedent, nor must they count in favor of his speedy trial claim.  *Loud Hawk*, 474 U.S. at 655.

"A defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial."  *Loud Hawk*, 474 U.S. at 656.  Petitioner was the appellant in both interlocutory appeals and thus bears the "heavy burden" of demonstrating that the delay occasioned by his two interlocutory appeals should weigh in favor of his speedy trial claim.  He has not met this burden.  He lost the first interlocutory appeal and does not claim the SCNM unjustifiably delayed.  Accordingly, there is thus no reason to count the first interlocutory appeal in favor of his speedy trial claim.

Petitioner also has not met his burden with respect to the second interlocutory appeal.  He prevailed, but that is not sufficient to count the time in favor of his speedy trial claim; he must show an unreasonable delay by the prosecution or a wholly unjustifiable delay by the appellate court.  *See Loud Hawk*, 474 U.S. at 657.  The record indicates Petitioner did not file his opening brief until approximately 25 months after the SCNM accepted certification and set a briefing schedule.  It is not clear why Petitioner required more than two years to file an opening brief in his interlocutory appeal, but this circumstance does not suggest delay by the state or by the SCNM, and it does not weigh in favor of his speedy trial claim.

Petitioner argued he should not be required to choose between constitutional guarantees.  This proposition is not entirely correct.  The right to a speedy trial sometimes must give way to other considerations such as the interests served by appellate review.  *Loud Hawk*, 474 U.S. at 313–14

16

("The *Barker* test furnishes the flexibility to take account of the competing concerns of orderly appellate review on the one hand, and a speedy trial on the other.")  Accordingly, in balancing the length of the delay and the reasons for the delay, the Court could conclude consistently with Supreme Court precedent that they do not support a Sixth Amendment violation.

### (2)      Third and fourth *Barker* factors

Moving to the remaining two factors, the Court concludes that the third factor weighs heavily against a speedy trial claim in this case, and that any actual or presumed prejudice does not shift the balance in Petitioner's favor.  Petitioner did not assert his right to a speedy trial until almost eight years after he was indicted.  A defendant has no duty to bring himself to trial, but our Supreme Court emphasizes that the failure to assert the right "will make it difficult for a defendant to prove that he was denied a speedy trial."  *Barker*, 407 U.S at 527, 532.

The fourth factor, prejudice, "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect."  *Barker*, 407 U.S. at 532.  These interests are: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.  *Id.*  The third interest is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Id.*

In this case, Petitioner did not suffer oppressive pretrial incarceration; he was in the fourth year of a twenty-year sentence when he was indicted in 2001.  [Doc. 8-8 at 54.]  Regarding the second interest, although Petitioner was already serving a lengthy sentence, the possibility of the death penalty reasonably could be expected to produce anxiety and concern.  The death penalty was not dismissed until nearly eight years after indictment.  [Doc. 8-6 at 33.]

17

The third interest—impairment of the defense—is more difficult to evaluate.  Witnesses may die or disappear, and memories may fade, but unlike deprivations of other constitutional rights, "deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself."  *Barker*, 407 U.S. at 521.  Delay often works in favor of the accused and "is not an uncommon defense tactic."  *Id.*  As the United States Supreme Court points out, quantifying prejudice is often not possible because one generally cannot be sure whether the prosecution or defense has been prejudiced more severely.  *Doggett*, 505 U.S. at 655.

Petitioner identified two circumstances he claims prejudiced his defense: one was the loss of his second chair attorney who left to become a judge; the second was that at trial, several witnesses changed their testimony to favor the prosecution from previous statements that favored the defense.  [Doc. 8-7 at 32–33.]  The SCNM rejected both of these as sources of prejudice, in part because Petitioner failed to produce evidence to show how he was prejudiced.  [Doc. 8-8 at 55.]  As discussed above, under clearly established law "affirmative proof of particularlized prejudice is not essential to every speedy trial claim."  *Doggett*, 505 U.S. at 644.  Nevertheless, the Court otherwise agrees with the SCNM that the loss of a second chair attorney is not a source of prejudice where Petitioner was represented by the same first chair attorney throughout the entire 8½ years.  Prejudice produced by witnesses who changed their testimony is at least partially mitigated, as the SCNM noted, by the use of their previous statements for impeachment purposes.

Petitioner argues the state interfered with his right to prepare for trial by allowing him to be sent to Arizona in 2001; he alleged he was not returned to New Mexico until 2003.  [Doc. 1 at 16.]  The record does not indicate the reason Petitioner was sent to Arizona.  However, the Court cannot infer prejudice from this allegation.  First, Petitioner does not allege the state caused him to be sent

to Arizona; he alleges the state "allowed" it to happen, and he was returned to New Mexico upon motion of his counsel.  [Id.]  Second, Petitioner does not explain either how his presence in New Mexico during the time he was Arizona was critical to his defense or how it caused delay.  Finally, after his return to New Mexico in 2003, Petitioner had five more years to prepare for his trial which did not occur until 2008.

In this case, it is at least as likely that delay made matters more difficult for the prosecution. "The passage of time may make it difficult or impossible for the Government to carry [its burden of proving its case beyond a reasonable doubt]."  *Loud Hawk*, 474 U.S. at 315.  To prove its case here, the State had to rely on the eye witness testimony of numerous inmates and former inmates who, by the time trial occurred, were attempting to recall events that had occurred more than nine years before.

Even if the Court were to presume Petitioner suffered anxiety over the possible death penalty and also that his defense had been impaired by delay in some manner, "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria."  *Doggett*, 505 U.S. at 655–66 (citation omitted).  The strength of a defendant's efforts to assert his speedy trial right is affected by the personal prejudice he experiences.  *Barker*, 407 U.S. at 531–32 ("The more serious the deprivation, the more likely a defendant is to complain.").  Petitioner asserted his speed trial right only after eight years, which suggests Petitioner acquiesced in the delay, did not perceive a great deal of prejudice, and that he did not, until then, wish to be speedily tried.  *See id.* at 534–35. Even after asserting his right to a speedy trial, Petitioner apparently occasioned further delay by seeking and obtaining a continuance of the trial date from July 2008 to November 2008.  [Doc. 8-8 at 53.]  Here, the third factor overcomes the minimal weight the Court would afford any anxiety or

prejudice Petitioner may have suffered under the fourth factor.

Based on its independent evaluation of the *Barker* factors in Petitioner's case, the Court concludes it is possible to balance the factors and reach the same conclusion as did the SCNM in a manner not inconsistent with clearly established Supreme Court precedent. There is no clearly established Supreme Court law mandating a balancing that reaches a result contrary to the SCNM's decision. Therefore, the SCNM's decision to deny Petitioner's Sixth Amendment claim is not objectively unreasonable in light of clearly established Supreme Court precedent.

## 2. Claim Two: Admission of evidence of gang affiliation

Petitioner argues the trial court erred in allowing the prosecution to "elicit irrelevant and highly prejudicial testimony concerning [Petitioner's] alleged gang affiliation." [Doc. 1 at 19.] He claims the prosecution used his alleged gang affiliation to demonstrate motive and relied on inmate witnesses and hearsay testimony. According to Petitioner, he is not the leader of a prison gang and was not "validated" as a prison gang member until after the crimes occurred. [Id.]

The SCNM considered this claim on direct appeal and concluded there was no error in admitting gang evidence. [Doc. 8-8 at 58–60.] The State's theory was that the attack on inmate Mares was the product of a gang war and the other inmates carried out Petitioner's orders because Petitioner was the leader of the gang. [Id. at 58.] The structure of the gang and Petitioner's position as its leader were explained through the testimony of individuals also charged as a result of the crimes. [Id.]

"Ordinarily, a state court's evidentiary rulings cannot be challenged in a federal habeas petition because they do not involve clearly established federal law." *Aviles v. Archuletta*, 389 F.App'x 853, 857–58 (10th Cir. 2010) (unpublished) (citation omitted)). Habeas relief is only

available "if the alleged error was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002) (citation, quotation marks, and brackets omitted).

The SCNM analyzed the issue under state rules of evidence which prohibit the use of a criminal defendant's prior bad acts as proof of character in order to show action in conformity therewith. [Doc. 8-8 at 58 (citing Rule 11-404(B) NMRA).] Under New Mexico law, it is improper to use evidence of gang affiliation "as a backdoor means of introducing character evidence." [Id. at 59 (citation omitted).] The SCNM reasoned that evidence of gang affiliation in Petitioner's case did not run afoul of state rules of evidence because a proper purpose was identified: the evidence was probative to show motive and to explain why the other inmates would follow his orders in carrying out the attacks. [Id.] The SCNM also considered whether the danger of unfair prejudice substantially outweighed its probative value, and concluded it did not. [Id.]

The SCNM's conclusion that the evidence was admissible, a conclusion to which this Court owes deference, is not contrary to clearly established law, nor is it an unreasonable application of Supreme Court precedent. *Brewer v. N. Dist. of Okla.*, 169 F.App'x 517, 520 (10th Cir. 2006) (unpublished). Petitioner's gang affiliation was not irrelevant—it was significantly probative as to motive, a permissible purpose. He concedes as much. The admission of gang evidence did not render the trial fundamentally unfair such that Petitioner was deprived of due process.

### 3.    Claim Three:  Jury instruction error

Petitioner argues the trial court committed error in the jury instructions by: (1) refusing to include his proffered causation instruction; and (2) issuing confusing first degree murder instructions. The SCNM rejected both arguments on direct appeal.

This Court also rejects jury instruction error as a basis for habeas relief in this case. "Habeas proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in a constitutional sense[.]" *Brinlee v. Crisp*, 608 F.2d 839, 854 (10th Cir. 1979) (citations omitted).

It is not clear why Petitioner believes a causation instruction was necessary. The causation instruction requires the prosecution to prove that death was a foreseeable result of the defendant's act and that the defendant's act was a significant cause of death. UJI Crim. 14-251 NMRA. On direct appeal, the State surmised that because Petitioner was one of three inmates who together allegedly stabbed corrections officer Ralph Garcia, Petitioner believes the prosecution was required to prove which of the approximately 28 stab wounds Petitioner personally inflicted and whether any of them caused Garcia's death. [Doc. 8-8 at 41.]

The Court cannot conclude that the trial court's refusal to include the causation instruction deprived Petitioner of a fair trial. Petitioner's dubious proposition aside, causation was not an issue. As the SCNM noted, the prosecution's theory was one of accessory liability, *i.e.*, that Petitioner intended, and helped, encouraged, or caused the murder of Garcia to be committed and thus could have been convicted regardless whether he personally inflicted the fatal wounds. *See* UJI 14-2822 NMRA; [Doc. 8-8 at 61–62.]

It also is unclear why Petitioner believes the first degree (willful and deliberate murder) instruction was confusing. In his briefing on direct appeal to the SCNM, he argued that the jury evidenced their confusion by asking two questions: (1) "Can we find the defendant guilty of felony murder and not guilty of first degree"; and (2) "Can we find him guilty of felony and first degree

22

and/or second?" [Doc. 8-7 at 44.]  The questions do not indicate that the jury was confused about whether they could convict Petitioner of felony murder, which they ultimately did.  In light of the fact that the jury deadlocked on first degree willful and deliberate murder, and the trial judge declared a mistrial as to that count, any alleged confusion regarding this instruction did not prejudice Petitioner, let alone render his trial fundamentally unfair.

### 4.      Claim Four:  Ineffective Assistance of Counsel - failure to obtain experts

Petitioner argues defense counsel was ineffective for failing to present expert testimony at trial.  To be entitled to habeas relief on a claim of ineffective assistance of counsel, Petitioner must show both that counsel provided deficient assistance and that there was prejudice as a result. *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 787 (2011) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  To establish the first prong, deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  On habeas review, the court must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  *Id.* at 689.  With respect to the second prong, prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Petitioner claims expert testimony was necessary to explain why some witnesses testified that they saw Petitioner striking Officer Garcia and others testified they saw Petitioner with a weapon stabbing Officer Garcia.  [Doc. 1 at 21.]  He also claims an expert was necessary to "expound" upon why the witnesses who testified to seeing him strike or stab Garcia were inmates, while the three corrections officers who testified did not claim to witness the incidents.  [Id.]

Petitioner has the burden of establishing that counsel's decision concerning the presentation of expert testimony was not the product of a reasonable strategic choice. *See Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002).  His allegations are far from overcoming the presumption of reasonableness.  As to the first prong, Petitioner has not identified the type of expert defense counsel should have called, and the Court declines to find counsel was deficient for failing to call an expert to explain purported discrepancies in eye witness testimony.  To the extent there was any discrepancy, a competent attorney reasonably could have concluded that the situation did not require an expert but could be addressed just as effectively by cross-examination and argument.

The Court also rejects Petitioner's argument that his attorney was required to call experts merely because the prosecution presented expert testimony.  "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."  *Harrington*, 131 S.Ct. at 791.  Thus, defense counsel was not ineffective merely because the prosecution put on expert testimony and he did not.  Petitioner does not identify the subject matter of the expert testimony that reasonably could have been expected to change the outcome of the trial, and thus cannot establish either prong of the *Strickland* test.

### 5.    Claim Five: Ineffective Assistance of Counsel - Right to Testify

Petitioner claims defense counsel did not prepare him to testify at trial.  Specifically, he states:

> [D]efense counsel had many years to consult with [Petitioner] to prepare a defense before trial.  When, in fact, the defense counsel never visit him until two months before trial which was to inform him of a plea offered by the prosecutor.  If the defense counsel had done his job, Petitioner would have been prepared to testify in his own behalf at trial.

[Doc. 1 at 24.]  The Court construes this as a claim of ineffective assistance of counsel.  *See Cannon*

*v. Mullin*, 383 F.3d 1152, 1170 (10th Cir. 2004).

These allegations fail to satisfy either prong of the *Strickland* analysis. "A convicted defendant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Petitioner does not claim he was not advised, nor unaware of his right to testify. And merely alleging defense counsel did not do his "job" does not tell the Court with sufficient specificity what counsel failed to do, nor does it identify in what manner Petitioner was not prepared.

As for the prejudice prong, Petitioner must show "a reasonable probability that [his] testimony would have raised in a juror's mind a reasonable doubt concerning guilt." *Cannon*, 383 at 1171 (citing *Strickland*, 466 U.S. at 694–95). The Court notes it is not at all uncommon for defense counsel to advise a criminal defendant against testifying at trial. Petitioner does not describe what his testimony would have been had defense counsel "done his job," nor does Petitioner explain how, if counsel had prepared him, his testimony would have changed the outcome of the trial. The Court therefore concludes this claim should be rejected.

**6.      Claim Six: Ineffective Assistance of Counsel - Conflict of Interest**

Petitioner claims he was denied effective assistance of counsel because his attorney, Mr. Blackburn, was "laboring under a conflict of interest." [Doc. 1 at 22.] Specifically, he claims Mr. Blackburn learned in 2001 that Petitioner intended to attack him at trial with a weapon. [Id. at 25.]

In 2002, the Government raised before the trial court the issue of whether Petitioner's alleged plan to attack Mr. Blackburn presented a conflict of interest interfering with Mr. Blackburn's duty of loyalty and distracting him from zealous representation. [Doc. 1-2 at 18.] Respondents' supplement indicates the trial court heard the motion on October 25, 2002, and determined that no

conflict existed.  [Doc. 13-1 at 3–4.]  The trial court's order states that neither Petitioner nor Mr. Blackburn claimed that a conflict existed.  [Id.]

This is not a case of multiple representation, nor is it a case where Petitioner or his attorney objected to the alleged conflict.  To the contrary, both Mr. Blackburn and Petitioner apparently denied the existence of a conflict.  Furthermore, the record belies Petitioner's allegation that the state court did not hear or resolve the alleged conflict.   Accordingly, this claim, like other ineffective assistance claims, is subject to *Strickland*.  *See Mickens v. Taylor*, 535 U.S. 162, 174–75, 122 S.Ct. 1237, 1245 (2001).  The Court does not presume that the alleged conflict imperiled Petitioner's right to a fair trial; instead, to prevail on a Sixth Amendment claim Petitioner "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708 (1980).  He has failed to do so.

First, Petitioner has not identified any manner in which the alleged threat of an attack adversely impacted Mr. Blackburn's performance, and upon review of the record the Court finds no indication that Mr. Blackburn's performance was deficient.  After learning of the allegations that his client might be planning to attack him, Mr. Blackburn nevertheless went on to defend Petitioner for the next several years, through two interlocutory appeals and a trial.  The second interlocutory appeal led to dismissal of the death penalty and thus was unequivocally successful for Petitioner.

Second, Petitioner fails to explain how exactly he was prejudiced by the alleged conflict of interest.  Petitioner does not benefit from the presumption of prejudice that applies when an attorney is actively representing the conflicting interests of multiple clients.  Given the absence of specific allegations of prejudice, the Court concludes this claim should be rejected.

26

### 7.    Claim Seven: Ineffective Assistance of Counsel - Funding limitations and unspecified errors

Petitioner claims that financial pressures compromised the quality of the representation. [Doc. 1 at 26–30.] This claim also fails both prongs of the *Strickland* analysis.

Despite receiving compensation that was undisputedly inadequate, the state courts consistently found that defense counsel's performance was not inadequate, and in fact was "excellent" and "of the highest professional standards." [Doc. 8-2 at 29, 54–55; Doc. 8-8 at 8.] The Court owes extreme deference to these findings. *See Harrington*, 131 S.Ct. at 787.

Petitioner's generic assertions that counsel failed to prepare for trial, make appropriate objections, investigate, or cross-examine witnesses do not meet his obligation to identify the specific acts or omissions that fell below an objective standard of performance. Furthermore, under clearly established Supreme Court precedent, Petitioner must still demonstrate prejudice, even if the representation somehow implicates counsel's personal or financial interests. *See Mickens*, 535 U.S. at 174–75.

"While even an isolated error can support an ineffective assistance of counsel claim if it is sufficiently egregious and prejudicial...it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791 (quotation marks and citations omitted). Here, the Court's review of the record and trial transcripts reveals Mr. Blackburn represented Petitioner with vigor, making appropriate objections and conducting skillful cross-examinations. Although the defense put on no witnesses, "[w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Id.* This is the strategy Mr. Blackburn employed. The Court

finds no support in the record for an ineffective assistance claim.

### 8.   Claim Eight: Ineffective Assistance of Appellate Counsel

Petitioner argues his appellate counsel, Liane E. Kerr, was ineffective for failing to consult with him before filing the appeal, presumably to confer with him regarding the issues to be raised. He claims she was ineffective for failing to argue he was actually innocent of the murder of Ralph Garcia, and for failing to argue that his trial counsel had been ineffective.  [Doc. 1 at 30–31.]  The Court finds no merit to these claims.

Appellate counsel was not ineffective for failing to consult with Petitioner about the issues to be asserted on appeal.  Counsel should consult with a defendant about the possibility of taking appeal, though the failure to do so is not always unreasonable.  *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 1035–36 (2000).  In this case, having determined that an appeal would be taken, there was no need to obtain Petitioner's consent regarding the issues to be asserted because such matters are left to counsel's professional evaluation.  *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308 (1983).

Appellate counsel also was not ineffective for failing to argue actual innocence or ineffective assistance of counsel.  Counsel does not have a duty to raise every nonfrivolous issue requested by the defendant, but may selectively choose among the issues in order to maximize the likelihood of success on appeal.  *Jones*, 463 U.S. at 751–52.  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  *Id.*

The Court concludes appellate counsel acted reasonably in omitting claims of actual innocence and ineffective assistance of counsel in favor of the issues she chose to assert.  The record

of the proceedings reveals that the case for actual innocence was not strong.  Furthermore, in New

Mexico, habeas is the procedure of choice for claims of ineffective assistance of counsel where the

defendant is unable to make out a prima facie case of ineffective assistance on the existing record.

*Duncan v. Kerbey*, 115 N.M. 344, 346–47, 851 P.2d 466, 468–69 (1993).

It follows from the these conclusions that Petitioner also cannot establish the prejudice prong

of *Strickland*.  Where, as here, counsel is appointed and follows the appropriate procedure for

asserting an appeal, the result of the proceedings is presumed reliable.  *Smith v. Robbins*, 528 U.S.

259, 287, 120 S.Ct. 746, 765 (2000).  The Court is not persuaded that Petitioner can overcome this

presumption, or that his input would have changed the result on appeal.

III.    **RECOMMENDATION**

The Court recommends the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by

Person in State Custody [Doc. 1], filed December 28, 2011, be DENIED and this case be

DISMISSED with prejudice.

_____
**W. DANIEL SCHNEIDER**
**United States Magistrate Judge**

29